**Certiorari Granted, July 26, 2011, Docket No. 33,057**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2011-NMCA-080**

**Filing Date:  April 29, 2011**

**Docket No.  29,561**

**STATE OF NEW MEXICO,**

        **Plaintiff-Appellee,**

**v.**

**MANUEL TURRIETTA,**

        **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Denise Barela Shepherd, District Judge**

Gary K. King, Attorney General
Santa Fe, NM

Ralph E. Trujillo, Assistant Attorney General
Albuquerque, NM

for Appellee

Trace L. Rabern
Santa Fe, NM

Scott M. Davidson
Albuquerque, NM

for Appellant

**OPINION**

**BUSTAMANTE, Judge.**

1

**{1}** Following a jury trial, Manuel Turrietta (Defendant) was found guilty of murder in the second degree (firearm enhancement) contrary to NMSA 1978, Section 30-2-1(B) (1994) and NMSA 1978, Section 31-18-16(A) (1993), shooting at or from a motor vehicle resulting in great bodily harm contrary to NMSA 1978, Section 30-3-8(B) (1993), aggravated battery with a deadly weapon contrary to NMSA 1978, Section 30-3-5(C) (1969), and tampering with evidence contrary to NMSA 1978, Section 30-22-5(B)(1) (2003). Defendant appeals, claiming that (1) the district court improperly closed the courtroom during the testimony of two confidential informants in violation of Defendant's right to a public trial under the Sixth Amendment to the United States Constitution and Article II, Section 14 of the New Mexico Constitution; (2) the State suppressed favorable material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and (3) Defendant is entitled to a judgment of acquittal or, alternatively, a new trial, under the cumulative error doctrine. We affirm Defendant's convictions.

## I. BACKGROUND

**{2}** On July 20, 2006, Defendant was involved in a gang-related shooting in Albuquerque, New Mexico. Defendant, a member of a gang known as Bad Boys Krew (BBK), shot and killed Alberto Sandoval (Victim), a member of a gang known as West Side, following a verbal exchange in a gas station/grocery store parking lot. Defendant explained that "[s]ome of the BBK brothers are from [Thugs Causing Kaos] TCK." Evidence was presented that Defendant was a member of TCK. Defendant confessed to the killing, but claimed that he had acted in self-defense.

**{3}** Prior to trial, Defendant moved to compel the production of any "and all documents that [the State had] in [its] possession related to gang affiliation" of certain witnesses, including the following confidential informants: David Torrez, Joshua Ayala, Brandon Neal, and George Morales. Additionally, Defendant sought an order "requiring the State to disclose . . . any and all motives for the confidential informants to cooperate with authorities in this case." In light of the State's alleged failure to provide this information in a timely manner, Defendant moved to strike the testimony of these witnesses and to suppress "any and all exculpatory information" pursuant to Rules 5-501, -503, and -505 NMRA and *Brady*, 373 U.S. 83.

**{4}** The City of Albuquerque moved to quash all subpoenas "seek[ing] the identification and records of confidential informants, as well as other records, the production of which may compromise the safety of individuals who are non-parties and further compromise on-going criminal investigations." The State filed a motion to clear the courtroom of unnecessary persons during the testimony of Torrez, Ayala, Neal, and Morales. The State alleged that these witnesses, all of whom were current or former gang members, had been threatened and/or beaten due to their involvement in this case. The State informed the district court that it was "fearful that other gang members, and possibly family members, affiliated with . . . Defendant will 'pack' the [c]ourtroom and 'maddog' the witnesses, or even try to physically intimidate [the witnesses] so that they will not testify."

2

**{5}** The district court held a hearing on the parties' discovery motions. At the hearing, the State argued that it did not intend to admit any "gang files" into evidence, instead the rivalry between the TCK and West Side gangs would be presented through the testimony of Albuquerque police officers "based on their experience and their training and . . . knowledge." Additionally, the State informed the district court that there were no confidential informant files related to this case because Torrez, Ayala, Neal, and Morales "came forward of their own volition" and were not given any "promises in return, not paid, nothing." Although there was one confidential informant file unrelated to this case, the State claimed that it was irrelevant to the proceedings and more prejudicial than probative because its disclosure could put the confidential informant in danger.

**{6}** The district court conducted an in camera review of the confidential informant file and held "that portions of the file should be redacted and limited portions produced subject to the provisions of [a] [p]rotective [o]rder." With respect to the gang files, the district court decided to "wait until trial and address those objections as they are presented." Defendant agreed that this was the appropriate course of action, stating that "[o]bviously we're asking for this gang material based upon what we think [the State is] going to try to do. If it is not successful doing it, I don't need this stuff. I don't care about it."

**{7}** The district court also held a hearing on the State's motion to close the courtroom during the testimony of Torrez, Ayala, Neal, and Morales. The district court recognized that, in light of Defendant's constitutional right to a public trial, the State had the burden to establish a "substantial probability of danger." The district court afforded the State an opportunity to fulfill its burden by conducting a limited voir dire of the confidential informants in a closed courtroom. Defendant objected, arguing that a closed courtroom, even during voir dire, violated the "First Amendment rights of the people in the gallery to be present" and Defendant's Sixth Amendment right to a public trial. In response, the district court informed the parties that, twice at the beginning of the trial, a graffiti "tagging" reading "TCK Blast" had been found outside of the courtroom. In light of the evidence of a gang presence in the courtroom, the court found that there was "a significant and compelling reason for the protection of witnesses . . . to determine whether or not there have been any threats to any of the witnesses who will be testifying."

**{8}** During voir dire, Torrez, a former member of TCK, testified that he was twice "jumped" or "beat up" in jail by other TCK members, Joey Leyba, Julian Leyba, Jason Rubio, and Anthony (last name unknown), for being a "snitch[]." Additionally, Torrez testified that "some fools broke [the] windows" of his girlfriend's car. At the close of Torrez' testimony, the State informed the district court that the individual with the moniker "TCK Blast" had been identified as Joey Leyba, one of the gang members who had physically beaten and threatened Torrez.

**{9}** George Morales, who was affiliated with "some" gangs, but no particular one, testified that there was "paperwork" out on him because he was a "witness," a "rat, snitch,

3

whatever." Morales clarified that "paperwork" meant an "open hit" and that the members of TCK "were going to try and get at me, kill me, whatever."

**{10}** In light of the danger to the witnesses and the evidence of an undetected TCK presence in the courtroom, the district court partially granted the State's motion to close the courtroom. The district court held that the immediate family members of both Defendant and Victim, as well as attorneys, staff members, and press, could remain in the courtroom during Torrez' and Morales' testimony, but that all other members of the public would not be permitted entry "for the purposes of witness protection, as well as the protection of [D]efendant and the [c]ourt." Defendant objected to the exclusion of "approximately [thirty] people who are extended family members of [D]efendant," noting that they had a First Amendment right to attend the proceedings and that Defendant had a federal and state constitutional right to their presence. The district court stated that it did not "know of any other alternatives," except to "request names and [s]ocial [s]ecurity numbers and allow the deputies to run these names to determine whether or not they've been affiliated with any gangs." Because a partial closure of the courtroom was the "least intrusive and least limiting alternative that the [c]ourt [could] come up with," the district court overruled Defendant's objection.

**{11}** The State withdrew its motion to close the courtroom during Neal's testimony, because during voir dire Neal testified that he had not been threatened by any TCK members and that he was "not worried" about any possible retaliation due to his in-court testimony. The district court denied the State's motion with respect to Ayala, because there was no testimony indicating that Ayala had been threatened by TCK or West Side gang members. Accordingly, the courtroom was open to the public during both Neal's and Ayala's testimony.

**{12}** At trial, Torrez, Morales, Neal, and Ayala all testified that Defendant had admitted to shooting and killing Victim. Based on this testimony, as well as Defendant's confession, the jury found Defendant guilty of murder in the second degree, shooting at or from a motor vehicle, aggravated battery, and tampering with evidence. Additional facts and procedural history will be set forth as necessary.

## II.    DISCUSSION

### A.    Partial Closure of the Courtroom

**{13}** Defendant claims that he was deprived of his right to a public trial under the United States and New Mexico Constitutions because the district court closed the courtroom to the general public during the testimony of Torrez and Morales. The State responds that the partial closure of the courtroom was justified by the threats of violence against the witnesses and the evidence of a gang presence at Defendant's trial.

4

**{14}** The district court's ruling on a motion to close the courtroom presents a mixed question of law and fact. We "review[ ] factual findings under a substantial evidence standard, viewing the facts in the light most favorable to the prevailing party, and we review de novo whether the district court correctly applied the law to the facts." *State v. Slayton*, 2009-NMSC-054, ¶ 11, 147 N.M. 340, 223 P.3d 337. The ultimate question of whether a constitutional violation occurred is a question of law, which we also review de novo. *State v. Brown*, 2006-NMSC-023, ¶ 8, 139 N.M. 466, 134 P.3d 753; *see United States v. Al-Smadi*, 15 F.3d 153, 154 (10th Cir. 1994) ("The underlying facts concerning the closure [of the courthouse] as found by the district court will be accepted unless clearly erroneous; however, whether the closure violated the Sixth Amendment is a legal issue which we review de novo.").

**{15}** The Sixth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI; *see In re Oliver*, 333 U.S. 257, 271-73 (1948) (holding that the Sixth Amendment right to a public trial applies to the states). "'Our cases have uniformly recognized the public-trial guarantee as one created for the benefit of the defendant.'" *Presley v. Georgia*, 130 S. Ct. 721, 724 (2010) (per curiam) (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979)).

> Whatever other benefits the guarantee to an accused that his trial be conducted in public may confer upon our society, the guarantee has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.

*In re Oliver*, 333 U.S. at 270 (footnote omitted).

**{16}** However, a criminal defendant's Sixth Amendment right to a public trial is not absolute. The United States Supreme Court has made clear that this "right . . . may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information. Such circumstances will be rare, however, and the balance of interests must be struck with special care." *Waller v. Georgia*, 467 U.S. 39, 45 (1984); *cf. Press-Enter. Co. v. Superior Court of Cal.*, 464 U.S. 501, 509 (1984) (holding, under the First Amendment, that "[c]losed proceedings, although not absolutely precluded, must be rare and only for cause shown that outweighs the value of openness"). To justify a complete closure of the courtroom,

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives

5

to closing the proceeding, and it must make findings adequate to support the closure.

*Waller*, 467 U.S. at 48.

**{17}** The Circuit Courts of Appeals "have developed a more lenient standard for closure orders which only partially exclude the public or are otherwise narrowly tailored to specific needs." *Davis v. Reynolds*, 890 F.2d 1105, 1109 (10th Cir. 1989). This is because "partial closures do not implicate the same fairness and secrecy concerns as total closures." *United States v. Osborne*, 68 F.3d 94, 98-99 (5th Cir. 1995). Under the more lenient standard, the party seeking closure need only proffer a "substantial reason," rather than an "overriding interest," to justify the limited exclusion of certain persons from the courtroom. *Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992) (internal quotation marks omitted); *Osborne*, 68 F.3d at 98-99; *United States v. Farmer*, 32 F.3d 369, 371 (8th Cir. 1994); *United States v. Sherlock*, 962 F.2d 1349, 1357 (9th Cir. 1992); *Nieto v. Sullivan*, 879 F.2d 743, 753 (10th Cir. 1989); *Douglas v. Wainwright*, 739 F.2d 531, 533 (11th Cir. 1984). Additionally, a partial closure satisfies the court's obligation to consider, sua sponte, reasonable alternatives to a complete closure of the proceeding. *Ayala v. Speckard*, 131 F.3d 62, 71 (2d Cir. 1997) (in banc) (noting that there is "nothing in the First Amendment cases or in *Waller* to indicate that once a trial judge has determined that limited closure is warranted as an alternative to complete closure, the judge must *sua sponte* consider further alternatives to the alternative deemed appropriate"); *see Presley*, 130 S. Ct. at 724 (recognizing that "trial courts are required to consider alternatives to closure[,] even when they are not offered by the parties").

**{18}** Torrez and Morales both testified that TCK gang members had threatened them with death or physical harm in retaliation for their cooperation with authorities. Additionally, there was evidence of a "TCK presence" in the courtroom, as reflected by the twice tagging "TCK Blast." The individual with the moniker Blast had been identified as Joey Leyba, a TCK gang member who had physically beaten and threatened Torrez. Under these circumstances, we agree with the Supreme Court of Ohio that "the dangerous nature of gang violence and the genuine need to protect witnesses testifying against gang members from the deadly threat of retaliation" is a "'substantial reason' to order the partial closure of [a] courtroom." *State v. Drummond,* 110 Ohio St. 3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 54; *see Woods*, 977 F.2d at 77 (recognizing that the "protection of a witness who claims to be frightened as a result of perceived threats meets both the 'substantial reason' and the 'overriding interest' standards"); *Feazell v. State*, 906 P.2d 727, 729 (Nev. 1995) (per curiam) (holding that a witness' interest "in her personal safety qualifies as both a 'substantial reason' and an 'overriding interest' sufficient to justify partially closing the trial").

**{19}** The partial closure of the courtroom was narrowly tailored to protect the witnesses, Defendant, and the court from specific threats of gang violence. The closure did not extend beyond Torrez' and Morales' testimony and did not exclude the immediate family members of Defendant or Victim, attorneys, staff, or the press from the proceedings. Although the

district court considered screening attendees for any gang affiliations prior to entry, we cannot disagree with the district court's determination that an order of partial closure was "the least intrusive and least limiting alternative." Accordingly, we conclude that Defendant's Sixth Amendment right to a public trial was not violated.

{20} Defendant argues that "any separate standard" for a partial closure was rejected by the United States Supreme Court in *Presley*. We disagree. In *Presley*, the district court excluded the defendant's uncle from juror voir dire because, as a general rule, it did not permit spectators to intermingle with jurors during jury selection proceedings. 130 S. Ct. at 722. The Supreme Court reversed, explaining that "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Id.* at 725. The Court recognized that "[t]here are no doubt circumstances where a judge could conclude that threats of improper communications with jurors or safety concerns are concrete enough to warrant closing *voir dire*," but held that the "generic risk of jurors overhearing prejudicial remarks, unsubstantiated by any specific threat or incident" was insufficient "to override a defendant's constitutional right to a public trial." *Id.*

{21} *Presley* is distinguishable from this case. First, *Presley* involved a complete closure because no spectators were permitted to remain in the courtroom during the entire jury selection proceedings. *See Commonwealth v. Cohen*, 921 N.E.2d 906, 922 n.28 (Mass. 2010) ("*Presley* addressed a full closure of the [courtroom]."). Second, in *Presley*, there was no evidence of a specific threat or incident to justify the district court's wholesale exclusion of spectators from the proceeding. By contrast, in this case, the district court's order of partial closure was supported by specific, articulable threats of retaliatory gang violence and evidence of a gang presence in the courtroom. Under these circumstances, we conclude that the district court struck a proper balance between the need for courtroom safety and Defendant's Sixth Amendment right to a public trial.

{22} Alternatively, Defendant argues that the New Mexico Constitution provides broader protection than the United States Constitution. The courts of this state have not previously construed the right to a public trial under Article II, Section 14 of the New Mexico Constitution. Where a state constitutional "provision has never before been addressed under our interstitial analysis, trial counsel . . . must argue that the state constitutional provision should provide greater protection, and suggest reasons as to why, for example, a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics." *State v. Leyva*, 2011-NMSC-009, ¶ 49, __ N.M. __, 250 P.3d 861 (internal quotation marks and citation omitted); *see* Rule 12-216(A) NMRA ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked[.]"). Defendant failed to provide the district court with any reasons for interpreting Article II, Section 14 of the New Mexico Constitution differently from its federal counterpart. Accordingly, we conclude that Defendant's state constitutional claim was not preserved for our review.

## B.     Suppression of Evidence

**{23}** Defendant next claims that the State suppressed favorable evidence that was material to the issue of guilt in violation of Defendant's right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution. Specifically, Defendant argues that the State improperly failed to disclose its "gang files" and the fact that the confidential informants either received or expected to receive compensation in exchange for their testimony. The State responds that evidence was not suppressed, but even if it was, there was no *Brady* violation because the evidence was immaterial to Defendant's guilt and was discovered during trial.

**{24}** The following additional facts are necessary for our resolution of this claim. Prior to trial, the State informed the district court "that no one who is listed as a confidential informant was a confidential informant on this case." Defendant responded that "that's just flat-out inaccurate. It's wrong." The State quickly clarified that it was "using the wrong terminology" and that it meant to say that "no one was paid, and there are no files related to this case." The State assured the district court that the confidential informants "freely gave information with no promises in return, not paid, nothing."

**{25}** At trial, it was revealed that one of the confidential informants, Morales, struck "a deal with the State to get released from jail, in exchange for [his] testimony." The State informed the district court that it had disclosed the deal to Defendant and that Defendant was "fully aware of that, the [Community Corrections Program] agreement and all of that." Defendant did not dispute that the State had disclosed this exculpatory material as soon as it had become available.

**{26}** Neal steadfastly maintained that no one from the State or law enforcement had given him anything in exchange for his testimony, except for traveling expenses and hotel accommodations during trial. The other confidential informants, Torrez and Ayala, offered conflicting testimony regarding their motivations for testifying. During voir dire, Torrez testified that he had received "[n]othing" in exchange for becoming a confidential informant. Thereafter, the following colloquy with defense counsel occurred:

> Q. Why did you [become a confidential informant]?
>
> A. To get out of jail.
>
> Q. Sorry?
>
> A. To get out of jail.
>
> Q. So you got out of jail by becoming an informant, right?
>
> A. Yes.

8

When he testified before the jury, Torrez clarified that he became a confidential informant because he "thought that would somehow help" him to "get out of jail." But when asked whether "[t]he State gave [him] a good deal on all [his] cases" in return for providing information, Torrez responded "I don't know. No." When asked more specifically whether his probationary status was reinstated in compensation for his cooperation with the authorities in this case, Torrez responded "No, they didn't help in my—they didn't help with my probation being reinstated."

**{27}** Ayala testified that he neither received nor expected to receive anything from the State in exchange for his testimony. During cross-examination, Defendant attempted to impeach Ayala's testimony with a prior inconsistent statement, in which Ayala explained, with regard to his then current sentence, that all "that's going to get dropped once [he was] done with doing all this stuff." Ayala admitted that his prior inconsistent statement was true, but also testified that "there's nothing out there to get rid of" because he had already "pled" guilty to all pending charges, "been sentenced," and was "just serving [his] time."

**{28}** "An alleged *Brady* violation [constitutes] a charge of prosecutorial misconduct." *Case v. Hatch*, 2008-NMSC-024, ¶ 47, 144 N.M. 20, 183 P.3d 905. "When an issue of prosecutorial misconduct is properly preserved by a timely objection at trial, we review the trial court's ruling on this issue under the deferential abuse of discretion standard because the trial court is in the best position to evaluate the significance of any alleged prosecutorial errors."[1] *State v. Trujillo*, 2002-NMSC-005, ¶ 49, 131 N.M. 709, 42 P.3d 814 (internal quotation marks and citation omitted). "The trial court should be upheld unless its ruling was arbitrary, capricious, or beyond reason." *Case*, 2008-NMSC-024, ¶ 47 (alteration omitted) (internal quotation marks and citation omitted).

**{29}** In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "In order to establish a *Brady* violation, the [defendant] must show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense." *Case*, 2008-NMSC-024, ¶ 44 (internal quotation marks and citation omitted). "[T]he 'prosecution' for *Brady* purposes encompasses not only the individual prosecutor handling the case, but extends to the prosecutor's entire office, as well as law enforcement personnel and other arms of the state involved in investigative aspects [of the case]." *Id.* ¶ 46 (second alteration in original) (internal quotation marks and citation omitted).

---

[1] Defendant argues that we should apply a more stringent standard of review because "the statements by the State made at the *Brady* hearing about the evidence were in fact false." As explained in the body of this opinion, there is no indication in the record that the State suppressed evidence or made false statements. Accordingly, we review the district court's ruling for abuse of discretion.

9

**{30}** Defendant has failed to establish that the State suppressed evidence in violation of *Brady*. Although, Morales struck "a deal with the State" sometime between the pre-trial hearing and the trial, the record reflects that the prosecutor promptly informed Defendant of this fact. Torrez' and Ayala's testimony was not a model of clarity, but it supports an inference that they were motivated to become confidential informants by the hope that they would receive favorable treatment from the State in exchange for their cooperation. However, there is no evidence to indicate that this hope was ever realized or that a deal with the State was ever reached. In the absence of such evidence, we cannot conclude that Defendant was deprived of his constitutional right to due process of law.

**{31}** Additionally, we hold that the district court did not abuse its discretion by delaying its ruling on Defendant's motion to compel certain gang files. Defendant informed the district court that a ruling on his motion was not necessary unless the State sought to admit the gang files into evidence. Defendant does not allege that the gang files were admitted into evidence or that he renewed his motion to compel during trial. *See Muse v. Muse*, 2009-NMCA-003, ¶ 72, 145 N.M. 451, 200 P.3d 104 ("We will not search the record for facts, arguments, and rulings in order to support generalized arguments."). Accordingly, we conclude that this claim was waived in the district court.

## C. Cumulative Error

**{32}** Lastly, Defendant argues that the State's "handling of the [confidential] informers–from the discovery errors . . . to the way they were protected from public scrutiny during testimony at trial–constituted cumulative error." "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial." *State v. Roybal*, 2002-NMSC-027, ¶ 33, 132 N.M. 657, 54 P.3d 61. In the absence of trial error, there can be no cumulative error. *See State v. Salas*, 2010-NMSC-028, ¶ 40, 148 N.M. 313, 236 P.3d 32; *State v. Casillas*, 2009-NMCA-034, ¶ 51, 145 N.M. 783, 205 P.3d 830. Because there was no trial error in this case, we reject Defendant's cumulative error claim.

## III. CONCLUSION

**{33}** We conclude that the partial closure of the courtroom during the testimony of two confidential informants did not deprive Defendant of his Sixth Amendment right to a public trial. We further conclude that the State did not suppress material evidence in violation of *Brady*. Accordingly, we affirm Defendant's convictions.

**{34}** **IT IS SO ORDERED.**

---

**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

10

**JAMES J. WECHSLER, Judge**


**JONATHAN B. SUTIN, Judge**

**Topic Index for *State v. Turrietta*, Docket No. 29,561**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-CE | Cumulative Error |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-CT | Confrontation |
| CT-IT | Interstitial Analysis |
| CT-IS | Involuntary Servitude |
| CT-NM | New Mexico Constitution, General |
| CT-SU | Suppression of Evidence |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-HO | Homicide |
| | |
| **CA** | **CRIIMINAL PROCEDURE** |
| CA-MP | Misconduct by Prosecutor |
| CA-PU | Public Trial |
| | |
| **EV** | **EVIDENCE** |
| EV-SU | Suppression of Evidence |